| | | |
|---|---|---|
| STATE OF INDIANA | ) | IN THE LAKE SUPERIOR COURT |
| | ) SS: | CIVIL DIVISION 2 |
| COUNTY OF LAKE | ) | |
| | | CAUSE NO. 45D02-1910-CT-001072 |


CHARLES J. HOPP,                                       )
                                                      )
                    Plaintiff,                        )
                                                      )
v.                                                    )
                                                      )
NORTHERN INDIANA PUBLIC                               )
SERVICE COMPANY LLC,                                 )
                                                      )
                    Defendant.                        )

## DEFENDANT'S EXPERT WITNESS DISCLOSURE

Defendant, Northern Indiana Public Service Company LLC ("NIPSCO"), by counsel, hereby submits its Expert Witness Disclosure and states as follows:

1.   John Loud, P.E., CFEI, CVFI, 149 Commonwealth Drive, Menlo, CA 94025. Mr. Loud is expected to testify regarding his review of materials related to this matter and the opinions contained in his report attached hereto as Exhibit "A". A copy of Mr. Loud's C.V. is attached to his report as Appendix "C".

2.   Jim Vaughn, CUSP, Denham Springs, Louisiana. Mr. Vaughn is a Senior Consultant with the Institute for Safety in Powerline Construction, Inc., which specializes in utility industry support providing assessment of work methods, training, program development, IOSHA compliance support and incident investigation.  Mr. Vaughn has approximately fifty years of experience in contractor and utility maintenance and operations.  Mr. Vaughn is expected to testify regarding his review of materials related to this matter and his opinions, including, but not limited to, the following:

a. The layout, design and functioning of the metal clad building and components reflected on NIPSCO 00223;

b. The operation of medium voltage circuit breakers, including, but not limited to, racking, removal and installation;

c. The acceptable method of performing inspection, testing and preventative maintenance on metal clad buildings and components, generally and in this particular case;

d. The scope of the work plan defined by NIPSCO and agreed upon by QP Testing (the "Work");

e. The switching procedures, holds and isolation zone associated with the Work;

f. QP Testing's failure to properly train Mr. Hopp and failure to follow applicable rules and regulations;

g. Mr. Hopp's failure: (1) to properly assess the Work; (2) to comply with all applicable rules and regulations; and (3) to perform the Work within the scope as defined by NIPSCO and described in the project documents that Mr. Hopp reviewed and signed;

h. QP Testing's failure to comply with all applicable rules and regulations with regard to the Work;

i. NIPSCO's compliance with all applicable rules and regulations with regard to the Work; and

j. Mr. Kutchek's opinions are unfounded and not supported by the evidence.

A copy of Mr. Vaughn's C.V. is attached hereto as Exhibit "B".

*Electrical Engineering & Computer Science
Buildings and Structures*



# E*x*ponent®

**Engineering Investigation in
the Matter of Hopp v NIPSCO
13.8kV Electric Shock Matter**



EXHIBIT

**A**

tabbies



# Engineering Investigation in the Matter of Hopp v NIPSCO 13.8kV Electric Shock Matter

Prepared for:

Brent Inabnit, Esquire
Counsel for NIPSCO
210 South Michigan Street
5th Floor - Plaza Building l
South Bend, Indiana 46601


Prepared by:

John Loud, MSEE, PE,[1] CFEI, CVFI
Principal Engineer
Exponent, Inc.
149 Commonwealth Drive
Menlo Park, CA 94025


November 3, 2023

© Exponent, Inc.

---

[1]    PE in seven states, not including Indiana.

Doc. no.  2309068.000 - 9366

# Contents

|  | Page |
|---|---|
| **List of Figures** | **iii** |
| **Introduction** | **1** |
| Retention | 1 |
| Allegations | 2 |
| Additional Relevant Background | 2 |
| **Engineering Analyses** | **3** |
| Call with Ed Kolar, NIPSCO | 3 |
| The One-Line Drawing | 4 |
| The Incident Equipment | 8 |
| **Conclusions and Bases** | **10** |
| Report Signatures | 36 |

Appendix A    Report Limitations
Appendix B    Testimony List for John Loud (Four Years)
Appendix C    Curriculum Vitae of John Loud
Appendix D    Cast of Characters

# List of Figures

Page

Figure 1.   One-line that was posted in the Metal Clad Switchgear Room.   5

Figure 2.   One-line marked up by me to show backfeed to Cubicle S9 (red), and the south bus cubicle numbering and the outline of the walk-in switchgear (blue).   6

Figure 3.   Crop of the one-line drawing showing the Isolation Zone (dashed red outline) from the HOLD Documents and the point of contact (green arrow).   7

Figure 4.   Cubicle S9 showing the shutters blocked open and the incident point of contact circled in yellow.   8

Figure 5.   The foreground breaker is the style used in Cubicle S9.   9

# Introduction

## Retention

1.      My name is John D. Loud.  I am a Principal Engineer at Exponent, Inc ("Exponent"), an engineering and scientific consulting firm headquartered in Menlo Park, California.  I have a Bachelor of Science in Electronics Engineering Technology, and a Master of Science in Electrical Engineering.   My detailed qualifications are set forth in my curriculum vitae attached as "Appendix C:  Curriculum Vitae of John Loud."  I was retained by counsel for Northern Indiana Public Service Company (NIPSCO).

2.      Exponent charges $675 per hour in 2023 for my engineering services.  My recent record of testimony is provided in "Appendix B:  Testimony List for John Loud (Four Years)."

3.      NIPSCO owns and operates a power generation facility called the R.M. Schaeffer Generating Station in Wheatfield, Indiana.  QP Testing, LLC ("QP Testing") was contracted to provide circuit breaker ("breaker") preventative maintenance electrical troubleshooting services to NIPSCO.  On or before May 18, 2019, breaker S7 in the Metal Clad Switchgear Room tripped and was removed from the switchgear by NIPSCO.   QP Testing examined the breaker and determined that it was serviceable and that it had no problem that would explain why it tripped. QP Testing was therefore asked to inspect Cubicle S7, the section of the switchgear that contained breaker S7 when it tripped.  NIPSCO put a Hold[2] (the HOLD) in place to isolate Cubicle S7 to allow for its inspection.  QP Testing signed on to the HOLD with the description of work being

---

[2]    Hold:  NIPSCO-prescribed procedure to obtain a zone of isolation within which a defined scope of work can be performed.  See NIPSCO C-01 Hold Card Procedure.  NIPSCO 00159-222.  HOLD refers to Hold 19001571.

"De-Energize 14 south 13.8kV bus for inspection of 13.8 s RAT [Reserve Auxiliary Transformer] Cubicle"—also known as Cubicle S7 (Application for Hold, Hold Card Component Summary).

4.      The case revolves around the accidental electrical shock of Charles "CJ" Hopp ("Hopp")[3], an employee of QP Testing, while he was working in Cubicle S9 of the 13.8kV switchgear on May 22, 2019.  The voltage that he contacted with his right hand was approximately 8,000 volts, and he sustained multiple injuries as the current exited his body in numerous locations and as he was thrown back against a breaker from the electrical shock.

## Allegations

5.      Plaintiff Hopp alleges that NIPSCO:

  i.      Failed to provide a safe [work] environment.

  ii.     Permitted dangerous working conditions.

  iii.    Failed to inspect the work area to keep it [in] a safe condition.  (Complaint.)

## Additional Relevant Background

6.      During my 7,680-hour IBEW apprenticeship on the Canadian Pacific Railroad, I learned all aspects of locomotive troubleshooting, repair, and rebuild.  Included in my training was troubleshooting, repair, preventative maintenance, and rebuilding of various types of electrical power contactors/breakers.  I routinely performed 'megger' testing to evaluate insulation, Ductor testing to test for elevated resistance in current paths and routinely practiced Holds and ensuring that my work was performed within the Isolation Zone.

---

[3]    See Appendix D for names referenced in this report.

# Engineering Analyses

## Call with Ed Kolar, NIPSCO

7.     I had an online call with Ed Kolar ("Kolar") of NIPSCO on October 23, 2023.  Kolar informed me about the following:

A.  The one-line drawing ("one-line") was always posted in the Metal Clad Switchgear Room that housed the north and south bus switchgear, and it was posted at the time of the incident.  This is the only one-line he is aware of for this switchgear.

B.  Based on the HOLD documentation given to QP Testing and the one-line in the room, he agrees with my assessment that QP Testing should have expected at least three energized stabs[4] in Cubicles N1, S2, and S9.  While S2 was actually shut down because Transformer 7 was de-energized, the supplied documentation should have advised QP Testing/Hopp that Cubicles N1, S2, and S9 had three energized stabs in each cubicle and that other cubicles may also have had backfeeds.[5]

C.  My cubicle numbering appears correct.

D.  My HOLD Isolation Zone is correct.

8.     The information contained in 7A–D was reviewed by Kolar on November 2, 2023, and was confirmed to be correct.

---

[4]   Stabs:  electrical breaker connections.

[5]   Backfeed:  electrical power flow that is opposite the normal.

## The One-Line Drawing

9.      A one-line drawing presents a simplified electrical schematic showing the electrical connections between electrical equipment.  It uses a single line to show the three phases of power to simplify the drawing—hence its name.

10.     Figure 1 shows the one-line drawing that was on the wall in the Metal Clad Switchgear Room where this incident occurred.  Hopp testified that he reviewed a one-line and also checked off that he reviewed one in QP Testing's Daily Safety Log dated May 22, 2019 (Hopp depo pp. 123–124, Exhibit 13).

11.     Figure 2 shows another version of the one-line with mark-up showing the backfeed in red from the north bus, through Switch 5003 to Cubicle S9.  It also shows the cubicle numbering used in numerous documents and testimony in this matter as well as the outline in blue of the equipment contained in the walk-in switchgear.

12.     An Isolation Zone is the equipment that is de-energized by a Hold.  The planned Isolation Zone to allow the planned work of inspecting Cubicle S7 is shown in Figure 3 and shows the Isolation Zone for HOLD number 19001571.  The Isolation Zone encompasses just a part of the equipment contained in the walk-in switchgear as shown.   Specifically not included in the Isolation Zone are any of the cubicles except for Cubicle S7.   Also added to Figure 3 for convenience is the scope of work or the "Description of Work" from the HOLD documents. Lastly, a green arrow shows Hopp's point of contact.



Figure 1.      One-line that was posted in the Metal Clad Switchgear Room.



CONFIDENTIAL                    NIPSCO 000482

Figure 2.    One-line marked up by me to show backfeed to Cubicle S9 (red), and the south bus cubicle numbering and the outline of the walk-in switchgear (blue).



Figure 3.    Crop of the one-line drawing showing the Isolation Zone (dashed red outline) from the HOLD Documents and the point of contact (green arrow).

## The Incident Equipment

13.     Figure 4 from the NIPSCO incident report shows incident Cubicle S9 with the incident point of contact circled in yellow.  The shutters are blocked open in this photograph, exposing the south bus contacts (top three) and the backfeed contact (bottom three).  There are no exposed energized parts unless the shutters are manually blocked open.



Figure 4.     Cubicle S9 showing the shutters blocked open and the incident point of contact circled in yellow.

14.     Figure 5 from the NIPSCO incident report shows the style of breaker that would fit in Cubicle S9.  The top three stabs would have connected to the south bus while the bottom three would connect to the Cubicle S9 load.



Figure 5.     The foreground breaker is the style used in Cubicle S9.

# Conclusions and Bases

15.     The following summary of conclusions is proffered to a reasonable degree of scientific and engineering certainty and is based on the information received and reviewed, inspections and testing by others, testing and analyses performed by me, as well as my education, training, and experience.  Should additional information be received, or should additional research, testing, or analysis provide further insight, I reserve the right to update these conclusions.

A. Nothing that NIPSCO did or failed to do caused or contributed to this incident in any way.  Bases include:

    a.  The scope of work assigned to QP Testing/Hopp was explicit and correctly communicated by NIPSCO in writing and only allowed work in Cubicle S7. NIPSCO met its duty to communicate the hazard to QP Testing/Hopp.  See Opinion B.

    b.  The NIPSCO HOLD was correct for the agreed scope of work, had no errors, and did not fail.  It was obvious that only Cubicle S7 was in the Isolation Zone and that other cubicles had energized or possibly energized equipment because they were isolation points for the Cubicle S7 HOLD.  See Opinion C.

    c.  The decision to add preventative maintenance (PM) on two breakers had nothing to do with the HOLD or its scope of work because it was work on de-energized equipment.  Furthermore, it did not establish any expectation that work be performed in Cubicle S9.  See Opinion D.

    d.  There is only one scope of work, and it is in writing on the HOLD documents, and the HOLD number is referenced on the Work Permit.  Conversations, text messages,

and such communications about other possible troubleshooting steps do not change the agreed scope of work.  Testing within Cubicle S7 was a part of the scope of work.  See Opinion E.

e.  The May 20, 2019, NIPSCO-requested Megger testing[6] of the line and load side of the south bus within Cubicle S7 was within the scope of work and safe within the existing HOLD, as was the possibility of Ductor testing the south bus Cubicle S7 connections within Cubicle S7.  See Opinion F.

f.  The cause of this accident was QP Testing's inadequate training and QP Testing/Hopp's failure to properly implement the HOLD.  See Opinion F.

g.  QP Testing/Hopp's job safety analysis (JSA) was below the standard of care and further illustrates QP Testing's inadequate training.  NIPSCO had no duty to check QP Testing's JSA content for completeness or accuracy.  See Opinion H.

h.  QP Testing had a non-delegable duty to provide a safe work environment to Hopp and the rest of the QP Testing crew as required by OSHA, NIPSCO policies, and QP Testing's lockout-tagout (LOTO) Program.  Not only was QP Testing's LOTO Program deficient, but it also was not followed.  See Opinion I.

i.  The opinions of Kenneth Kutchek ("Kutchek"), the expert retained by Hopp's legal counsel, to the contrary are unfounded and refuted by the evidence.  See Opinions J through O.

j.  Further supporting this main opinion are Opinions P through S.

---

[6]  Megger testing:  Common vernacular to describe dielectric strength testing.  Megger was the manufacturer of one of the early dielectric strength testers.

B.  The scope of work assigned to QP Testing/Hopp was explicit and correctly communicated by NIPSCO in writing and only allowed work in Cubicle S7.  NIPSCO met its duty to communicate the hazard to QP Testing/Hopp.  Bases include:

    a.  NIPSCO required QP Testing/Hopp to review and sign the "Work Permit which signifies a discussion of the work scope and Isolation Zone was held with the Holder" (Work Permit, NIPSCO 000362).

    b.  NIPSCO provided the Hold Card Component Summary to QP Testing/Hopp.

    c.  The scope of work ("Description of Work") was explicitly and precisely written on the Hold Card Component Summary and stated: "De-Energize 14 south 13.8kV bus for inspection of 13.8 s RAT Cubicle"—also known as Cubicle S7.

    d.  The Isolation Zone was explicitly and precisely provided by the Hold Card Component Summary and the posted one-line drawing that Hopp reviewed (Sup-Rog 1, Hopp depo pp. 123–124, Exhibit 13).  Also explicitly disclosed was that at least Cubicles N1, S2, and S9 had or likely had exposed energized equipment because they were isolation points.  The posted one-line clearly showed that the connection to Cubicle S9 had the warning "CAUTION POSSIBLE BACKFEED."  (See Figure 2.)

    e.  NIPSCO informed QP Testing/Hopp that Cubicle S9 was an isolation point on the Hold Card Component Summary.  An isolation point is by definition a point where electrical power is interrupted and therefore the cubicle will or may have energized stabs.  This was also shown on the posted one-line drawing that Hopp reviewed.

    f.  QP Testing understood NIPSCO's communication of the hazard because they recorded on their Daily Safety Log that the highest voltage present for the work was 15kV and that the electrical hazard present was "15kV bus is shut down."  In

addition, QP Testing checked having competed four relevant items on the "Safety Checklist."

C. The NIPSCO HOLD was correct for the agreed scope of work, had no errors, and did not fail. It was obvious that only Cubicle S7 was in the Isolation Zone and that other cubicles had energized or possibly energized equipment because they were isolation points for the Cubicle S7 HOLD. Bases include:

a. The breaker in Cubicle S7 tripped and was reported smoking. This breaker was therefore checked, and no problem was found. (No Hold was required or put in place to PM this breaker.) The next logical step in troubleshooting was to investigate Cubicle S7. This was the permitted work and resulting HOLD.

b. Therefore, the planned work was to "De-Energize 14 south 13.8 kv bus for inspection of 13.8 s[outh] R[eserve] A[uxiliary] T[ransformer] Cubicle." (Application for Hold, Hold Card Component Summary.) That is, the planned work was to inspect Cubicle S7, and the 13.8kV south bus had to be de-energized to do the planned work.

c. All possible power sources were isolated from the south bus as required to provide the planned Isolation Zone of south RAT (Reserve Auxiliary Transformer) in Cubicle S7. The south bus had contacts in Cubicle S7 (and all other south cubicles).

d. There was no unexpected or unanticipated backfeed in Cubicle S9. The East Main 12.5kV (S9), South Main Feed (S2) and the North-South Tie (N1) were specifically opened and racked out[7] to disconnect the south bus from power and provide the

---

[7]   Racking out a circuit breaker means to physically disconnect it from an electrical bus.

required Isolation Zone for Cubicle S7. These racked-out breakers were isolation points to disconnect the south bus from power so Cubicle S7 would be de-energized.

e. Kutchek correctly testified that "any one of the breakers could have been potentially a backfeed" (Kutchek depo p. 152).

f. The Hold Card Component Summary that was attached to the Work Permit and reviewed by Hopp/QP Testing showed the following:

  i. To isolate the load side of Cubicle S7:

   1. From 15E, Order 2 locked out 15E 6.9kV Reserve Feed Breaker, Order 9 shut off the control power so this breaker could not be turned back on, and Order 10 racked it out.

   2. From 14S, Order 1 locked out 14S Reserve Feed Breaker, Order 11 removed the fuses to the DC control power so this breaker could not be turned back on, and Order 12 racked it out.

  ii. To isolate the line side of Cubicle S7:

   1. The south bus had to be de-energized.

  iii. To isolate the south bus from the powered north bus:

   1. Order 13 removed the fuses to shut off control power to tie breaker N1, and Order 14 racked out N1.

   2. Note: Breaker N1 is an isolation point, and three of the stabs in Cubicle N1 necessarily remained energized.

  iv. To isolate the south bus from its main feed:

1. Order 15 removed the fuses to the DC control power so this breaker could not be controlled, and Order 16 racked out the main feed south breaker in Cubicle S2.

2. Note: Breaker S2 is an isolation point, and three of the stabs in Cubicle S2 would appear from this documentation to have remained energized.[8]

v. To isolate the south bus from the backfeed from the East Main 12.5 kV Distribution Transformer (S9):

1. Order 23 removed the S9 fuses to the DC control power so this breaker could not be controlled, and Order 24 racked out the breaker.

2. Note: Breaker S9 is an isolation point, and three of the stabs in Cubicle S9 necessarily remained energized.

vi. The remaining orders served to complete the Cubicle 7 Isolation Zone.

D. The decision to add PM on two breakers had nothing to do with the HOLD or its scope of work because it was work on de-energized equipment. Furthermore, it did not establish any expectation that work be performed in Cubicle S9. Bases include:

a. Preventative maintenance on a breaker is only performed on a de-energized breaker and does not require a Hold. For example, no Hold was required or enacted when the tripped breaker from S7 was worked on by QP Testing on the evening of May 18, 2019.

---

[8]   Additional switching orders not on the Hold Card Component Summary had switched off the main feed but was not part of the HOLD.

b.  Equipment owners only expect contractors to perform requested work.  There is no evidence that NIPSCO requested any work inside Cubicle S9.

c.  Work inside any cubicle requires a Hold to create an Isolation Zone sufficient to safely perform the planned work.  There was no Hold for work in Cubicle S9.

d.  Any argument that PM of the breaker from Cubicle S9 required work in Cubicle S9 because the breaker was racked out but still in Cubicle S9 and on the rails is wrong.  Specifically:

   i.  In the event that Hopp found the breaker off and racked out but still in Cubicle S9, it was QP Testing/Hopp's obligation to contact NIPSCO to have it removed for PM work.

   ii.  If work was required that broke the plane of the cubicle, then a Hold was required.

e.  QP Testing/Hopp were working without a work permit inside Cubicle S9 because the approved permit did not include working there.

f.  QP Testing JSA outlining the PM work to be done on the breakers ("megger, ductor, Hipot, time breakers") correctly lists no energy hazard because it is de-energized work.

E.  There is only one scope of work, and it is in writing on the HOLD documents, and the HOLD number is referenced on the Work Permit.  Conversations, text messages, and such communications about other possible troubleshooting steps do not change the agreed scope of work.  Testing within Cubicle S7 was a part of the scope of work.  Bases include:

a.  It is the written scope of work that was agreed to and signed by both parties.

b.   The HOLD is planned based on the specific description of work that is on the Application for Hold.

c.   Work performed beyond what is planned may not be covered by the HOLD and is not authorized by the Work Permit.

d.   QP Testing/Hopp signed the NIPSCO HOLD documents limiting the scope of work to Cubicle S7.

e.   QP Testing's Daily Safety Log:

　　i.   Had checked "Discussed safety issues with the customer & reviewed their policies."

　　ii.   Had checked "Reviewed the work plan or quote about today's scope of work."  The scope of work was limited to inspection of Cubicle S7.

　　iii.   Had checked "Reviewed the one-lines and drawings applicable to today's work."  The one-line they reviewed showed energized equipment in N1, S2, and S9.

　　iv.   Had checked "Reviewed the <u>written</u> LOTO plan and procedures for today." The HOLD documents were these "<u>written</u> LOTO plan and procedures."

f.   The QP Testing LOTO Program required "Written, step-by-step isolation procedures detailing shutdown and startup will be put together for each type of equipment or machine."

g.   The text message at 08:18 on May 20, 2019, between NIPSCO's Rudolph and QP's Blanton that Kolar wanted QP to Megger the line and load side of the bus did not change the scope of work.  Furthermore, Megger testing from the south bus terminals inside Cubicle S7 to ground would have been safe within the HOLD.

h. The text message at 12:50 on May 21, 2019, between QP Testing's Blanton and Frank that NIPSCO might want QP Testing to Ductor test the bus in the back, did not change the scope of work.  Furthermore, Ductor testing from the Cubicle S7 line stabs to the bus in the back of Cubicle S7 would have been safe within the HOLD.

i. Testing within Cubicle S7 was within the scope of work.  Specifically:

    i. The Hold Card Component Summary "Description of Work" states that there would be an "inspection" of Cubicle S7.  Inspection commonly includes testing.

    ii. NIPSCO and QP Testing understood the Cubicle S7's HOLD "inspection" to include testing because:

        1. Rocky Rudolph ("Rudolph") (of NIPSCO) texted Blanton (of QP) at 08:18 on May 20, 2019, that Kohler wanted Vinay Naik ("Vinay") (of QP) to Megger the line and load sides of the bus, and neither acted to have the HOLD revised.

        2. Blanton and Rudolph texted at and after 12:45 on May 21, 2019, about Ductor testing the [bus] connections, and neither acted to have the HOLD revised.

        3. Blanton sent Frank a text at 12:50 on May 21, 2019, telling him that NIPSCO wants QP to torque the bus and might Ductor test the bus in the back, yet QP Testing did not act to have the HOLD revised.

    iii. QP Testing reported in its JSA that its Basic Job Steps were to "megger ductor Bus," yet it did not act to have the HOLD revised.

    iv.  "QP Testing was contracted by NIPSCO to inspect and test the 14/15 –

13.8kv South Switchgear Cubicle (Reserve Auxiliary Transformer South

RTS) and to perform preventative maintenance on two (2) medium voltage

circuit breakers that were racked out of the south buss" (DROG 17).

   j.  If the scope or description of work changes, then the work must be stopped until the

HOLD and Work Permit are revised to accommodate the new scope or description of

work.  No stop work or HOLD revision indicates there was no new scope or

description of work.

F.  The May 20, 2019, NIPSCO-requested Megger testing of the line and load side of the south

bus within Cubicle S7 was within the scope of work and safe within the existing HOLD, as

was the possibility of Ductor testing the south bus Cubicle S7 connections within Cubicle

S7.  Bases include:

   a.  The existing HOLD de-energized and isolated the south bus so it was ready to be

Megger tested.

   b.  Megger testing only required accessing Cubicle S7, which was within the HOLD's

Isolation Zone.

   c.  The de-energized Cubicle S7 and south bus also allowed the possibility of Ductor

testing the Cubicle S7 south bus connections from the connections in Cubicle S7 to

the south bus in the back of Cubicle S7 under the existing HOLD.

G.  The cause of this accident was QP Testing's inadequate training and QP Testing/Hopp's

failure to properly implement the HOLD.  Bases include:

a.  Hopp signed that he discussed safety issues with the customer and reviewed their policies on the QP Testing Daily Safety Log dated May 22, 2019, yet he failed to follow NIPSCO's safety policies.

b.  Hopp signed that he reviewed the work plan or quote about today's scope of work, yet he failed to follow the written scope of work to inspect Cubicle S7.

c.  Hopp signed that he reviewed the one-line drawing on the QP Testing Daily Safety Log dated May 22, 2019, yet he apparently failed to understand that it showed cubicles with energized or potentially energized equipment that he claims to have entered.

d.  Hopp signed that he reviewed the written LOTO plan on the QP Testing Daily Safety Log dated May 22, 2019, yet he failed to limit his work to that which was prescribed on the HOLD and Work Permit.  He worked beyond the HOLD's description of work to "De-energize 14 South 13.8kV Bus for Inspection of 13.8 S[outh] RAT [Reserve Auxiliary Transformer] Cubicle."

e.  QP Testing/Hopp received a copy of the Hold Card Component Summary when they/he signed on to the NIPSCO HOLD, and they/he reportedly reviewed the one-line, which was posted on the wall in the Metal Clad Switchgear Room.  These clearly showed:

   i.   Cubicle N1 (north-south bus tie breaker) was an isolation point and had three energized stabs.

   ii.  Cubicle S2 (main feed south bus) was an isolation point and had three energized stabs.[8]

   iii. Cubicle S9 (RATS) was an isolation point and had three energized stabs.

   iv. All cubicles except S7 had the potential for backfeed.

   v. The Isolation Zone was limited to the south bus and Cubicle S7.

f. QP Testing/Hopp signed the Work Permit signifying that a discussion of the work scope and Isolation Zone was held with the Holder (Rudolph), yet he worked outside the Isolation Zone.  Michael Engel ("Mike") and Vinay also signed onto the Work Permit.

g. Work performed outside the planned Isolation Zone is not isolated; therefore, it is always assumed to be energized work.

h. Had QP Testing only worked in the prescribed and agreed-to Isolation Zone, this incident would not have happened.

i. Hopp admits that he was aware of the potential for backfeed in the switchgear and claims to have tested every cubicle to confirm the absence of voltage (Hopp depo pp. 124, 143–144).

j. Hopp entered Cubicle S9 without permission, climbed over the breaker and defeated the shutters that are the built-in protective barrier in each cubicle, and put his hand on the energized load stab in Cubicle S9.

k. Even after Hopp violated the Isolation Zone by entering Cubicle S9, he was still not exposed to any energized equipment.  It was only after Hopp defeated the built-in barrier by opening the shutters and locking them open using vise-grip pliers that he exposed the energized stabs.

l. No formal LOTO training was provided to Hopp by QP Testing; just on-the-job training was provided (Engel depo p. 102).

m. QP Testing found no record to indicate that Hopp had ever been trained according to the QP Testing LOTO Program.

n. Engel (who ran the QP Testing business) assumed that Hopp was trained concerning the QP Testing LOTO Program, but he did not know this for a fact (Engel depo p. 104).

o. Engel did not know what QP Testing did to ensure that its employees were trained concerning the QP Testing LOTO Program (Engel depo p. 104).

p. Part of a 10-hour OSHA course that reportedly addressed LOTO and that Hopp attended fails to demonstrate that Hopp was trained and proficient in LOTO.  Nor was any course content, certificate of completion, or date of instruction provided.

q. Engel's claim that very experienced Chuck Hopp must have trained CJ Hopp is not adequate.  Specifically:

    i. We know nothing about Chuck Hopp's training.

    ii. We know nothing about whether Chuck Hopp's practices are outdated or whether he has stayed current with best practices.

    iii. There is no documentation to establish when training was conducted, what was covered, and how CJ Hopp performed when evaluated.

    iv. What is known is that CJ Hopp's actions support the finding that Chuck Hopp's training was inadequate.

H. QP Testing/Hopp's JSA was below the standard of care and further illustrates QP Testing's inadequate training.  NIPSCO had no duty to check QP Testing's JSA content for completeness or accuracy.  Bases include:

a.  It was obvious that Holds were required for QP Testing/Hopp to perform the testing described and Kutchek agrees (Kutchek depo p. 97), yet QP Testing/Hopp failed to circle Holds and to fill in the HOLD number on the JSA.  He presumably also failed to review with field personnel this critical information that was not filled in on the JSA.

b.  QP Testing/Hopp failed to have the JSA reviewed by the "Next Level" "Supervisor/Superintendent" "PRIOR to beginning work," despite filling in the date that it was reviewed.

c.  QP Testing/Hopp failed to "Identify Risks or Potential Risks" for the job steps of "megger ductor bus."  Megger testing the bus involved making electrical connections to the bus and therefore required Holds.  Ductor testing the bus also involved making electrical connections to the bus and therefore required Holds.

d.  QP Testing/Hopp failed to list what they were doing to "Eliminate/Manage Risks" and what "Preventative Measures" they were taking for the job steps of "megger ductor bus."  Megger testing the bus involved making electrical connections to the bus and therefore required Holds.  Ductor testing the bus involved making electrical connections to the bus and therefore required Holds.

e.  NIPSCO's signature was to verify that QP Testing/Hopp had filled out the JSA, not to check its content.  Specifically:

   i.  The "Step 5: Reviewed (Prior or During the Work Shift)" was **not** required prior to starting work and only meant that the JSA was completed (Rudolph p. 95).

     ii.   NIPSCO's review was not required before work began.  "During the shift, a NIPSCO representative will review and sign the JSA to ensure it has been completed" (Generation Contractor Safety Orientation, NIPSCO 00103).

   f.   "Once the JSA meets the next level supervisor's expectations and is signed, the immediate supervisor can proceed with a pre job briefing with all employees involved with performing the task" (Generation Contractor Safety Orientation, NIPSCO 00101, slide 25).  Hopp began work before having the substandard JSA reviewed and approved as was required.

   g.   In support of the above bases, see sections A.2.3, 3.3.3 and 3.15.2 of NIPSCO's Contractor Health, Safety & Environmental Manual 2.0.

I.   QP Testing had a non-delegable duty to provide a safe work environment to Hopp and the rest of the QP Testing crew as required by OSHA, NIPSCO policies, and QP Testing's lockout-tagout (LOTO) Program.  Not only was QP Testing's LOTO Program deficient, but it also was not followed.  Bases include:

   a.   Engel testified that the company (QP Testing) was responsible for its employees' safety (Engel depo p. 150).

   b.   Kutchek testified that QP Testing had a duty to keep its employees safe (Kutchek depo p. 136).

   c.   29 CFR 1910.269 OSHA violations include:

     i.   1910.269 titled "Electric power generation, transmission, and distribution" applies to this site.

ii.   1910.269 defines "Contract employer. An employer, other than a host employer, that performs work covered by this section under contract."  QP was the contract employer.  NIPSCO was the host employer.

iii.  1910.269.a.2.ii.E:  QP Testing failed to teach Hopp to recognize the electrical hazard to which he was exposed and further failed to teach him the skills and techniques necessary to avoid this hazard.

iv.   1910.269.a.2.iv:  QP Testing failed to at least annually supervise and inspect Hopp's safety-related work practices required by this section.

v.    1910.269.a.3.iii:  QP Testing as the contract employer failed to coordinate its work rules and procedures to comply with the NIPSCO HOLD to provide the required protection of this section.

vi.   1910.269.c.2:  QP Testing failed to cover in the job briefing "energy-source controls" as evidenced by this incident and the deficient JSA.

vii.  1910.269.d.2.i:  QP Testing failed to establish a program of energy control procedures and employee training to ensure that before Hopp performed service on Cubicle S9, the energy source was rendered inoperative.

viii. 1910.269.d.6.vii:  QP Testing failed to test for the absence of voltage in Cubicle S9 before beginning work.

d.   29 CFR 1910.333 OSHA violations include:

i.    1910.333.a.1:  QP Testing failed to de-energize live parts before Hopp worked on them (Cited by OSHA).

ii.   1910.333.b.2:  QP Testing failed to LOTO the equipment in Cubicle S9 before working on it.

    iii.  1910.333.b.2.ii.B:  QP Testing failed to disconnect all energy sources from the equipment to be worked on.

    iv.  1910.333.b.2.iii.A-C:  QP Testing failed to tag the disconnecting means that would have isolated Cubicle S9.

    v.  1910.333.b.2.iv.B:  QP Testing failed to test to verify the absence of voltage (Cited by OSHA).

    vi.  1910.333.c.3.ii:  QP Testing failed to maintain the minimum approach distance of 2.0 feet from equipment energized between 2 and 15 kV.

e.  While NFPA 70E does not apply to utility generation equipment, QP Testing purports to adhere to its requirements.  Violations of NFPA 70E (2018) include:

    i.  120.4.A.1:  QP Testing was required to use up-to-date one-line drawings to locate sources of power.  NIPSCO had the required one-line drawing posted on the wall of the Metal Clad Switchgear Room.

    ii.  120.4.A.5:  Perform a complex LOTO that identified the elements of control (120.4.B), de-energized the elements of control (120.4.B.1), and tested for the absence of voltage (120.4.B.6).

    iii.  120.5.7:  Perform a live-dead-live test on the voltage tester to reliably establish the absence of voltage.

    iv.  130.2:  QP Testing failed to establish an "Electrically Safe Work Condition."

f.  "Work performed offsite is regulated by the site operator's program unless it is less stringent than QP Testing LLC program."  QP/Hopp failed to follow either the QP Testing LOTO Program or NIPSCO's Hold Card Procedure.

g.  No evidence was found to date to demonstrate that Hopp was ever trained per QP's requirement that "[a]ffected employees are required to attend annual training for the lockout/tagout program."  See also section titled "TRAINING" (QP Testing LOTO Program).

h.  The QP Testing LOTO Program required that "[a]ll individual members will put their individual locks on the group's lockout or tagout device after they have verified the procedure," yet no evidence was found to date to that QP Testing/Hopp verified NIPSCO's HOLD.

i.  The QP Testing LOTO Program section of "Verification of Isolation" does not include testing for the absence of voltage using live-dead-live as is required by best industry practices, OSHA, and NFPA 70E.

j.  Hopp/QP failed to isolate the equipment they planned to work on such that "[i]solation of the equipment will be performed by an authorized employee who must also determine the exposure status of the individuals in the group" (QP LOTO Program).

k.  Hopp, Mike, and Vinay signed the QP Testing Daily Safety Log dated May 22, 2019, certifying that "[b]y signing this form, I agree to personally verify that all equipment is locked-out and de-energized each time I touch it," yet they did not.  QP Testing/Hopp/Engel and Vinay all failed to verify that all equipment they planned to work on was locked-out and de-energized.  Had this QP Testing requirement been followed, this incident would not have happened.

l.   Engel testified that the QP Testing Daily Safety Log dated May 22, 2019, "identified that there's a 15,000-volt voltage present at the equipment" (Engel depo p. 169), yet they failed to provide the required protection.

J.   Kutchek's opinions that for the bus work the JSA need not identify energized equipment as a risk if QP Testing had an understanding that the equipment was to be de-energized (Kutchek depo 103:3–10) and that preventative measures need not be listed because QP Testing typically de-energizes things before working on them is nonsense (Kutchek depo 103:21–104:7).  Bases include:

a.   The point of the JSA is to list the risks and the preventative measures so they can be discussed with the working personnel.

b.   The risk of working on a bus that is normally energized is that it will be energized when they go to work on it, and this risk must be listed.  It is nonsense to say that knowing there is a plan to mitigate the risk eliminates the need to list the risk.

c.   It is also nonsense to state that knowing that LOTO or Hold would be utilized eliminates the need to list the required steps to mitigate the risk.

d.   It is disingenuous for Kutchek to dismiss the missing risk and its mitigation on the JSA because the missing 15 kV risk and the lack of mitigation were the cause of this incident.

K.   Kutchek's opinion that there are no documents to show the additional scope of work and that deposition testimony needs to be reviewed to ascertain the scope of work is incorrect (Kutchek depo pp. 113–114).  Only the written and agreed-to scope of work for the HOLD establishes what it was.  Bases include:

a. The HOLD establishes the Isolation Zone.  Work outside the Isolation Zone is potentially energized work as occurred in this incident.

b. The scope of work is specific, in writing, and agreed to by the signatures of NIPSCO and QP Testing/Hopp.

c. Kutchek presents no standard, OSHA regulation or other basis to support the opinion that anything other than what is written on the HOLD establishes the scope of work (SOW).

d. It is an unfounded, artificial construct to argue that there are different scopes of work (e.g., NIPSCO's SOW, QP Testing's SOW, initial SOW, updated SOW, etc.); there is only one, and it is the one in writing on the HOLD that both parties signed.

L. Kutchek's opinion that NIPSCO was required to specifically inform QP Testing about the backfeed in Cubicle S9 is unfounded and uses information guided by the incident. Specifically:

a. The HOLD and Work Permit are specifically crafted to inform workers where they can work, not where they cannot work.

b. Hopp testified that he reviewed the one-line, that it shows backfeed, and that it showed the ability to be backfed.

c. NIPSCO did inform QP Testing/Hopp about the backfeed in S9 in the supplied documentation as described above.

d. If Hopp had been injured in Cubicle N1, S2, N7, or somewhere in the yard, then Kutchek would have opined that NIPSCO was required to inform QP Testing about another specific energized point.  QP Testing/Hopp knew or should have known that there was energized 15kV equipment **everywhere** outside of the Isolation Zone.

M. Kutchek's opinion that "NIPSCO was responsible for all Holds associated with work requested to be performed by QP Testing" is incorrect.  Bases include:

    a.  NIPSCO executed the HOLD that was required pursuant to the HOLD documents and planned work and it didn't fail.  See Opinion B.

    b.  QP Testing/Hopp signed on to the HOLD, representing that they:

        i.  Agreed with the scope of work that was limited to Cubicle 7.

        ii.  Had verified the HOLD, including reviewing the one-line drawing and the HOLD documents.

        iii.  Agreed with the Isolation Zone.

    c.  QP Testing had a non-delegable duty to provide a safe work environment to Hopp as required by OSHA, NIPSCO policies, and the QP Testing LOTO Program.  See Opinion I.

N. Kutchek's opinion that, if there is a potential for backfeed, an electrical worker should test it before you put your hand into the load side, is wrong because there is much more than testing that is required (Kutchek depo p. 151).  His attempt to draw a distinction between the ability to be backfed and actually being backfed (Kutchek depo p. 158) is a meaningless distinction in the context of performing work safely.  Bases include:

    a.  Working after only testing would violate OSHA, NFPA 70E, and all legitimate LOTO procedures.

    b.  Testing for the absence of voltage is no assurance that equipment will remain de-energized.  This is the reason that a Hold is required.  Equipment must first be de-energized with an isolation point before testing to confirm the absence of voltage.

    c.    Even if QP Testing/Hopp tested Cubicle S9 and found the absence of voltage, it was not safe to work in it because it was not in the Isolation Zone.

    d.    It is plain and readily obvious on the one-line drawing that the south bus is connected to the north bus through two transformers if Switch 5003 is closed and that this condition is noted by "CAUTION POSSIBLE BACKFEED."

O.  Kutchek's opinion that racking out of the S9 breaker and leaving the door open created a new hazard of energized components inside the cubicle with the door guard not preventing anyone from accessing the cubicle is unfounded (Kutchek depo p. 175).  Bases include:

    a.    There is no hazard unless the plane of the cubicle is broken by entering a cubicle without a Hold.  Energized parts are not exposed but are covered by insulating shutters.

    b.    Kutchek opines that "once the scope of the assignment was changed by NIPSCO to include preventive maintenance of the S9 breaker, NIPSCO was required by standards, policies and practices to re-evaluate their HOLD cards due to the S9 back feed" (Kutchek depo pp. 171–172, Exhibit 5), yet:

        i.    Kutchek admits the obvious that racking out a breaker does not require a Hold (Kutchek depo p. 175).

        ii.    Kutchek admits the obvious that PM on a breaker does not require a Hold (Kutchek depo p. 175).

        iii.    Kutchek admits that nothing would have happened to Hopp had he entered Cubicle S9 and not defeated the shutters.

    iv.  Kutchek admits that it was NIPSCO policy that only NIPSCO could remove a breaker from a cubicle for such work and that QP Testing was obliged to request this before doing the requested PM.

  c.  It is common and accepted practice to open and rack out breakers as isolation points such as occurred here.  Entry to a cubicle requires a Hold, and Hopp agreed to such in his deposition.

P.  Hopp's testimony that he tested for the absence of voltage in all nine cubicles of the south bus is refuted by the evidence.  Bases include:

  a.  QP Testing was cited by the Indiana Occupational Safety and Health Administration (IOSHA) under 29 CFR 1910.333.b.2.iv.B for failing to test for the absence of voltage in Cubicle S9.

  b.  Failed Switch 5003 was replaced at 01:32 on May 22, 2019, and had to be closed to provide a coal feed before the HOLD could be accomplished (Caputo depo p. 21, Exhibit 2).  There was, therefore, a backfeed at all times after 01:32 to Cubicle S9, and Hopp would have found it energized if he had measured it correctly with a functional instrument.

  c.  Had QP Testing/Hopp tested in Cubicle N1, they/he would have found that the three stabs from the north bus were energized.

  d.  This incident could have happened when Hopp reportedly worked in Cubicle N1 because it had three stabs that remained energized.  Only the specified work for the HOLD within Cubicle S7 was safe.

  e.  The May 28, 2019, QP Testing report to IOSHA is consistent with the evidence and states that QP Testing engineers only tested for the absence of voltage:

      i.  On each phase in Cubicle 7.

     ii.  Outside on the incoming feed to the bus.

f.  The Engel report of the incident that was written before May 28, 2019, is consistent with the evidence and states that QP Testing engineers only tested for the absence of voltage:

      i.  On each phase in Cubicle S7.

     ii.  Outside on the incoming feed to the bus.

g.  The Vinay report of the incident dated May 28, 2019, is consistent with the evidence and states that QP Testing engineers only tested for the absence of voltage:

      i.  On each phase in Cubicle S7.

     ii.  Outside on the incoming feed to the bus.

h.  The QP Testing Accident/Incident Report dated May 24, 2019, is consistent with the evidence and states that QP Testing engineers only tested for the absence of voltage:

      i.  On each phase in Cubicle S7.

     ii.  Outside on the incoming feed to the bus.

Q.  QP Testing/Hopp's NFPA 70E Category 1 ranking for personal protective equipment (PPE) on the QP Testing Daily Safety Log dated May 22, 2019, is incorrect and insufficient.

a.  NFPA 70E Category 1 is for panelboards or other equipment rated 240 volts and below and has an arc-flash boundary of 19 inches (Table 130.7(C)(15)(a)).

b.  Category 4 is for metal-clad switchgear, 1 kV through 15 kV and specifies a minimum working distance of 36 inches and an arc-flash boundary of 40 feet  (Table 130.7(C)(15)(a)).

c.  NIPSCO texted QP Testing to bring Category 4 gear on May 20, 2019.

d.  Listing the wrong ranking for PPE illustrates disregard for safety.

R.  Hopp's testimony is that he was aware of the potential for backfeed (Hopp depo p. 134) yet claims he "was told by NIPSCO, and shown on their paperwork, that any potential for backfeed was gone" (Hopp depo pp. 141–142) and that Order 24 on the Hold Card Component Summary showed that the backfeed was gone (Hopp depo p. 142).  These claims are unfounded and refuted by the evidence.  Bases include:

a.  The NIPSCO HOLD documents do not list anything about Switch 5003, or either of the Solid Blade switches as isolation points.  The NIPSCO paperwork therefore shows an obvious backfeed to Cubicle S9 and the warned backfeed condition.

b.  The NIPSCO HOLD documents show the breaker in Cubicle S9 to be an isolation point containing energized equipment whereby:

   i.  Order 23:  Removal of the fuse to interrupt control power for the breaker in Cubicle S9.

   ii.  Order 24:  Rack out the breaker in Cubicle S9.

c.  While Rudolph had physically verified the Hold Card Component Summary Orders 1–25, he had not reviewed the one-line drawing and was not aware of the backfeed to Cubicle S9 prior to this incident.  Therefore, Rudolph could not have informed Hopp that the backfeed was gone.  Nor is there testimony of any other possible source to support Hopp's claim.

d.  Even if it is assumed, contrary to the evidence, that Hopp was told that the backfeed was gone, QP Testing/Hopp had a non-delegable duty to independently verify the HOLD.  See Opinion I.

S.  Hopp was not authorized to enter Cubicle S9 for any purpose.  Bases include:

    a.  Cubicle S9 work was not included by the Work Permit.

    b.  Only inspection of Cubicle S7 was on the HOLD.

    c.  The HOLD documents showed that Cubicle S9 had energized equipment.

    d.  Cubicle S9 had not been tested for the absence of voltage.

**Report Signatures**

Date:  November 3, 2023

Signed

_____
                                     JL223

John Loud, MSEE, PE,[9] CFEI, CVFI
Principal Engineer


Reviewed by Nathan P. Mayercsik, Ph.D., P.E., as Engineer in Responsible Charge

Signed

Nathan P. Mayercsik, Ph.D., P.E.
Managing Engineer
Professional Engineer No. 12200819
Licensed by the Indiana Professional Licensing Agency
State Board of Registration for Professional Engineers

---

[9]    PE in seven states, including Washington, PE # 49008.

# Appendix A:  Report Limitations

Exponent investigated specific issues relevant to the accused products as requested by counsel. The scope of services performed during this investigation may not adequately address the needs of other users of this report, and any reuse of this report or its findings, conclusions, or recommendations presented herein is at the sole risk of the user.  The opinions and comments formulated during this assessment are based on observations and information available at the time of the investigation.  No guarantee or warranty as to future life or performance of any reviewed condition is expressed or implied.

The findings presented herein are made to a reasonable degree of engineering certainty.  We have made every effort to accurately and completely investigate all areas of concern identified during our investigation.  If new data become available or there are perceived omissions or misstatements in this report regarding any aspect of those conditions, we ask that they be brought to our attention as soon as possible so we have the opportunity to fully address them.

# Appendix B:  Testimony List for John Loud (Four Years)

## Depositions

| Date | P/D | Case | Venue |
|------|-----|------|-------|
| 2018-03-07 | D | Wabtec v Siemens | United States Patent and Trademark Office Superior Before the Patent Trial and Appeal Board, Case IPR2017-00981, IPR2017-01263 |
| 2018-03-16 | P | Federal Insurance v Marvair, Micro-Air | United States District Court, Southern District of Florida |
| 2018-03-29 | P | Belo v Bally Hallinan Properties | Superior Court of California, County of San Francisco, No. CGC-16-552777 |
| 2018-06-01 | D | Wabtec v Siemens | Preliminary Injunction Hearing No. 17-cv-1687 |
| 2018-06-05 | D | Wabtec v Siemens | United States Patent and Trademark Office Superior Before the Patent Trial and Appeal Board, Cases<br><br>IPR2017-01821<br><br>IPR2017-01454 |
| 2018-07-03 | D | Wabtec v Siemens | United States Patent and Trademark Office Superior Before the Patent Trial and Appeal Board, Case IPR2017-01263 |
| 2018-08-22 | D | Meadows v TDE et al | Superior Court of California, County of Los Angeles, Case No. BC615590 |
| 2018-08-28 | D | Wabtec v Siemens | United States Patent and Trademark Office Superior Before the Patent Trial and Appeal Board, Case IPR2017-01533<br><br>IPR2017-01866 |
| 2018-09-12 | D | Wabtec v Siemens | United States Patent and Trademark Office Superior Before the Patent Trial and Appeal Board, Case IPR2017-02104 |
| 2019-01-24 &25 | D | Barber/Richmond v SCE | Superior Court of California, Case No. BC 497689 |
| 2019-09-25 | D | Cohoun v Lou Char Properties | Superior Court of California, Case No. BC672909 |
| 2019-09-14 & 15 | D | Wabtec v Siemens | |
| 2020-06-17 | D | Barrera v SCE, Mowbray's, UTI | Superior Court of California, Case No.: CIVDS1700188 |
| 2020-09-11 | D | Poeschel v Xcel | Wisconsin Circuit Court, Pepin County, Case No.: 2018CV000027 |
| 2020-11-10 | D | Fisher v THE Insurance | United States District Court, District of Maryland |

| Date | P/D | Case | Venue |
|------|-----|------|-------|
| 2021-02-02 | D | State Farm and Deutsch v Ford | United States District Court Northern District of Ohio Eastern Division 1:19-CV-00783-DRC |
| 2021-08-31 | D | Poeschel v Xcel | Wisconsin Circuit Court, Pepin County, Case No.: 2018CV000027 |
| 2022-02-17 | D | Robertson v Greenlee | In the Circuit Court of the 19th Judicial Circuit … St. Lucie County, Florida Case No. 562016CA001169 |
| 2022- | D | Van Dellen v Eaton | SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES No. 19STCV33021 |
| 2022-09-27 | P | Perez (Mountain) v DP Electric, San Oak | SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF ALAMEDA No. RG17857926 |
| 2022-11-03 | D | Reichardt v Electrolux Class Action | UNITED STATES DISTRICT COURT EASTERN DISTRICT OF WISCONSIN, Case No. 17-cv-00219-BHL |
| 2023-01-03 | D | Bardin v Nissan | UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF KENTUCKY BOWLING GREEN DIVISION, CASE NO. 1:21-CV-00144-GNS-HBB |
| 2023-02-13 | D | Penniman v Fitness 19 | SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE COUNTY OF RIVERSIDE-SOUTHWEST JUSTICE CENTER Case No. CVSW2106115 |
| 2023-04-29, 5-20 | D | Maggio v First Solar | SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY, CASE NO. 20CV000925 |
| 2023-09-11 | D | Lewis v Impact Electrical | SUPERIOR COURT OF WASHINGTON IN AND FOR KING COUNTY, No. 22-2-16621-5 SEA |
| 2023-10-26 | D | Sperry v Appalachian Power Company | |

## Trial/Arbitration Testimony

| Date | P/D | Case | Venue |
|------|-----|------|-------|
| 2018-04-30, 05-04 | P | Belo v Ballyhallinan Properties | Superior Court of the State of California, County of San Francisco Case No. CGC-16-552777 |
| 2018-08-01 | D | Wabtec v Siemens | Preliminary Injunction Hearing No. 17-cv-1687 |
| 2018-12-13 & 14 | D | Leon v Sunbeam | 2nd Trial: Case No.  CJ-2013-6668, District Court of Oklahoma County, State of Oklahoma |

| Date | P/D | Case | Venue |
|------|-----|------|-------|
| 2019-05-20, 21, 22 | D | JUDICIAL INQUEST INTO THE DEATH OF RESHALL JIMMY | High Court of South Africa Case: I08/2018 |
| 2019-08-27, 28 | D | JUDICIAL INQUEST INTO THE DEATH OF RESHALL JIMMY | High Court of South Africa Case: I08/2018 |
| 2020-01-28 | D | Colhoun v Lou-Char Property | Superior Court of CA, County of Los Angeles, Case:  BC672909 |
| 2021-10-05, 06 | D | Poeschel v Xcel Energy | State of Wisconsin, Circuit Court, Pepin County, Case No. 18-CV-000027 |
| 2023-06-09, 12, 28 and 07-05 | P | Perez (Mountain) v DP Electric, San Oak | SUPERIOR COURT OF THE STATE OF CALIFORNIA COUNTY OF ALAMEDA No. RG17857926 |
| 2023-06-15 | D | Maggio v First Solar | SUPERIOR COURT OF CALIFORNIA, COUNTY OF MONTEREY, CASE NO. 20CV000925 |

B-3

# Appendix C:  Curriculum Vitae of John Loud



**Exponent®**
Engineering & Scientific Consulting

## John D. Loud, P.E., CFEI, CVFI

Principal Engineer  |  Electrical Engineering & Computer Science
149 Commonwealth Drive | Menlo Park, CA 94025
(650) 688-7216 tel | jloud@exponent.com

## Professional Profile

Mr. Loud specializes in electrical engineering issues. He addresses issues related to electronic systems including printed circuit board problems, electronic component failures, circuit analysis, and propagating failures. He has investigated numerous incidences involving electrocutions and electric shocks and has also conducted many investigations involving electrical/electronic products that are alleged to have caused fires. His expertise further includes work with lighting products, rotating electric machines, as well as secondary battery systems in the area of lithium ion cell testing and protection systems, NiMH, NiCad, and lead acid charging systems.

His test results and recommendations for products using lithium ion cells have been used by many in the portable electronics industry. He has performed fault analysis on electrical distribution equipment, breakers and switchgear. Mr. Loud also has experience with industrial electronic equipment including automated metering equipment, locomotive black-box event recorders, and locomotive control equipment. He is experienced in addressing issues related to electronic manufacturing and service, equipment production, test and circuit board rework and repair. He is also experienced in applying relevant electrical codes and standards including the NEC, NESC, General Orders 95, 128, 165, OSHA, UL, ANSI, etc.

Prior to joining Exponent, Mr. Loud worked for Neta Corporation and Q-Tron Industrial Electronics and worked as a consultant for companies such as General Motors EMD Division, Burlington Northern Railroad, CSX Railroad, and the Atchison Topeka & Santa Fe Railroad.

## Academic Credentials & Professional Honors

M.S., Electrical Engineering, San Jose State University, 1995

B.S., Electronics Engineering Technology, DeVry Institute of Technology, 1992

Tau Beta Pi

Eta Kappa Nu

# Licenses and Certifications

Licensed Professional Engineer, Arkansas, #16740

Licensed Professional Electrical Engineer, California, #17564

Licensed Professional Engineer, Oklahoma, #27594

Licensed Professional Engineer, Oregon, #91186PE

Licensed Professional Engineer, Michigan, #6201058107

Licensed Professional Electrical Engineer, Minnesota, #57907

Licensed Professional Engineer, Washington, #49008

Licensed Professional Engineer, Virginia, #0402055983

Certified Fire and Explosion Investigator (CFEI) in accordance with the National Association of Fire Investigators, National Certification Board

Certified Vehicle Fire Investigator (CVFI) in accordance with the National Association of Fire Investigators, National Certification Board

# Professional Affiliations

Institute of Electrical and Electronic Engineers — IEEE

Order of the Engineer (member)

# Publications

Wright SA, Loud JD, Blanchard RA. Globules and beads: What do they indicate about small-diameter copper conductors that have been through a fire? Journal of Fire Technology 2015; 51(5):1051-1070.

Loud JD, Hu X. Failure analysis methodology for Li-ion incidents. Proceedings, 33rd International Symposium for Testing and Failure Analysis, pp. 242-251, San Jose, CA, November 6-7, 2007.

Loud JD, Murray SJ, Ray RM, Iyer M, Jackson O. Shock injury risk assessment of portable and handheld appliances and use environments. Proceedings, 57th Annual International Appliance Technical Conference, Rosemont, IL, March 27-29, 2006.

Loud JD, Murray SJ, Caligiuri RD. Failure modes in Calrod-type heaters used in home appliances. Proceedings, 57th Annual International Appliance Technical Conference, Rosemont, IL, March 27-29, 2006.

Loud JD. Vector control of an induction machine. Master's Thesis, San Jose State University, 1995.

### Presentations and Published Abstracts

Loud JD. The science of electric shocks. Guest lecture at Stanford University, 2007, 2008, 2009.

Loud JD. Accelerated stress testing for home appliances. IEEE ASTR Conference, San Francisco, CA, October 2006.

Loud JD. Top ten failures in electronic circuits. Presented to Engineers at Apple Corporation, April 1997 and at Dell Computer Corporation, February 1998.

Loud JD. Electronic case history review — Learn from someone else's design mistakes. Presented to 300 Engineers at Hewlett Packard Corporation, November 1997.

Loud JD. Safety design of electronic circuits. Presented to IEEE in Austin, TX, February 1998.

Loud JD, Hsu P. Evaluation of vector controlled induction motors as joint actuators for industrial robots. Proceedings, IASTED International Conference Robotics and Manufacturing, Honolulu, HI, August 19-22, 199.

### Reports

Loud JD. Compact driver and controller Part II — Vector control. Report for General Electric Nuclear Energy, 1995.

Book Chapters

Loud JD, Blanchard R, Mimmack G. Electronic Failure Analysis Handbook. Chapters 16 and 20, McGraw Hill, January 1999.

Loud JD. Operations and Maintenance of the Datacord 2000 Locomotive Crash Recorder. Manual for Q-Tron Ltd., 1988.

# Project Experience

2500 Amp Breaker Failure:  Root cause failure analysis.

Arcing and Fire in Electrical Switch Gear:  NEC Violations.

Hot Tub Controller Failure:  Design defect resulted in recall.

Electrocution:  Expert testimony:  Cause of death and the role of an electrician's fish tape.

Electrocution:  Investigate the cause of death and document the site.

Numerous neon sign investigations.

100 KVA Distribution Transformer:  Document tear down and subsequent testing.

4800/240 Transformer:  Expert testimony:  Evaluate 6 pole-mounted transformers supplying power to a building that caught fire.

112kV Transformer:  Evaluate transformer windings to determine the root cause of the failure.

Rice Cooker Electrocution:  Identified defect that caused electrical fault.

Heat Tape Testing:  Investigate failure modes and potential for fire initiation.

Generator Winding Failure:  Root cause failure analysis and prediction of susceptibility of remaining population.

Circuit Board Failure in ATM Machine:  Root cause failure analysis and failure projection.

Lithium ion cell testing:  Identify unsafe operating parameters.  (Numerous types and form factors).

Lithium ion cell protective devices for notebook computers: Evaluated failure modes and circuit weaknesses in the protection electronics.

Metal Oxide Varistors, MOVs:  Evaluate performance and failure modes.

Lithium ion cell protective devices for cellular phones: Evaluated failure modes and circuit weaknesses in the protection electronics.

AC Adapters: Evaluated for potential failure modes including fire initiation.

15kV Vacuum Switch:  Determine the root cause of distribution power factor correction control failures.

Transient Suppressor Failures:  Evaluate the performance and failure mode of transient protectors used on wind turbine generating equipment.

Computer Monitors: Evaluate root cause failure analysis and potential for fire initiation.

Desktop Computer: Evaluate a burned computer and perform testing to determine whether it was the cause or the victim of a fire.

5kV Cable: Root cause failure analysis.

5kV Cable Splice: Identified workmanship-caused failure.

FM Transmitter Fire: Root cause failure analysis for radio station fire.

Water Level Controller: Identified an installation oversight that resulted in a flood.

Solar Simulators, Searchlights and Photovoltaic product line review.

Stepper Motor Failures in Eye Measuring Equipment: Root cause failure analysis.

Instantaneous Hot Water Heater: Evaluate the controller performance.

Instrumentation and Controls Evaluation at an Oil Refinery.

Review of Telephone Switching Equipment involved in a fire.

Project the reliability of telephone switching subjected to mechanical shock based on Bellcore standards.

# Appendix D:  Cast of Characters

| Name | Involvement |
| --- | --- |
| ____, Frank | QP Testing |
| Blanton, | QP Testing |
| Caputo, Andrew | NIPSCO, line supervisor, filled out Hold Application |
| Combs, D | NIPSCO |
| Emery, Jay | NIPSCO |
| Engel, Michael (Mike) | QP, working at NIPSCO at the time of the incident |
| Engel, Tom | QP Testing, ran the QP Testing business |
| Hildenbrandt, Aaron | NIPSCO, Electrician present for discussions |
| Hopp, Charles | Injured, Plaintiff |
| Hopp, Chuck | QP, father of Plaintiff |
| Ireland, Matthew | NIPSCO, Manager of Safety |
| Kolar, Edward | NIPSCO, Electric and Instruments and Controls, Superintendent overseeing the job |
| Kutchek, Kenneth | Expert retained by Plaintiff |
| Minix, Alan | NIPSCO, production personnel |
| Palecki, Bob | NIPSCO, Stationed Electrical Engineer |
| Rudolph, Rockwell | NIPSCO, Electrical Maintenance Planner |
| Rossellini, Eric | QP |
| Selman, Matt | NIPSCO, Boss of Rocky Rudolph |
| Sangster, Kurt | NIPSCO, VP Generation |
| Stamps, Dustin | NIPSCO, signed Application for Hold |
| Tolton, Steve | NIPSCO, Electrician witnessed review of scope of work |



**Curriculum Vitae 2023**
**Jim Vaughn**
**Denham Springs, Louisiana**

## Introduction

A specialist in powerline safety, work methods and procedures, Jim Vaughn has over 49 years of experience in contractor and utility maintenance and operations. Mr. Vaughn has authored numerous procedure and standards documents and training outlines. His original curriculum for Line Technician training is used broadly across Florida and the electric utility industry. Vaughn is an experienced Expert Witness and SME in litigations for utilities, in particular those facing OSHA and civil litigation. Mr. Vaughn has also delivered many hours in the college classroom and field training, recognized for his effective technology transfer skill.s In 2013 Vaughn was awarded the John McRae Safety Leadership award by USOLN, an organization of over 1,700 utility safety professionals.

## Education:

    1998, Baptist College of Florida; BSM, Classical Music Literature
    1978, Palm Beach Atlantic University; Business Communications
    2005-2006, Georgia Institute of Technology, Continuing Ed.; Electrical Distribution Technology, OSHA
    2005 University of Georgia School of Government, Continuing Ed.; Municipal Governance

## Professional Engagements

    Member in Good Standing GIGRE US National
    Member Institute of Electrical and Electronics Engineers
    Senior Consultant, Institute for Safety in Powerline Construction, Alexandria, LA
    Senior Safety Manager; Global Energy Services, South Portland, ME
    Currently Senior Member of the Editorial Board; Incident Prevention, USOLN
    Vice Chair; Utility Safety and Operations Leadership Network
    Director of Safety; Atkinson Power, a subsidiary of Clark Construction, Mesa, AZ
    Director of Safety and Human Resources; Dillard Smith Construction, a Quanta Company, Chattanooga, TN
    Director of Regulatory Compliance: MYR Group, Sturgeon Electric, Mesa, AZ
    Director of Safety; Marietta Power, Marietta GA.
    Director, Electrical Distribution Technology Program; Lake Sumter Community College, Lake City, FL,
    Director, Electrical Distribution Technology Program; South Florida State College, Sebring, FL

## Certifications

    Master Electrician 20130107974, State of California
    Master Electrician, unlimited Electrical Contractor, 600079, State of Colorado
    Journeyman Lineman; 1975, IBEW Local 759, Ft. Lauderdale, FL
    Industrial Hygiene, ASSE
    Master Electrician, Georgia Unrestricted EN008841
    Certified Traffic Control Supervisor, Electrical Distribution Technology Program
    OSHA Industry Outreach Trainer in General Industry and Construction Industry Standards, Georgia Institute of Technology, DOL-OSHA ID #20860.
    Safety Program Manager, DOL Incident Investigations, DOL
    Certified Utility Safety Professional, USOLN
    Emergency Management Certification; FEMA IS-100; IS-300; IS-500 and IS-700

## Author

    AS Degree Program and Curriculum; Electrical Distribution Technology; Florida DOE, South Florida University
    AS Degree Program and Curriculum; Electrical Distribution Technology, Lake-Sumter Community College
    Substation Training Program; Northwest Lineman's College, Median, ID
    Corporate Safety Manual; Peace River Electric Cooperative, Sumterville FL
    AS Degree Program Curriculum; Electrical Distribution Technology, Lake-Sumter CC, Lake City FL
    Switching and Tagging Program; Sumter Electric Cooperative, Sumterville FL
    Personal Protective Grounding Manual; Salt River Project, Phoenix, AZ
    Feature Article; 101 Train the Trainer, Incident Prevention Magazine 2013 to present
    Feature article; Q&A, Incident Prevention Magazine, 2013 to present

## Demonstrated Skills

**Safety:** Specialist in OSHA and MSHA standards including application of industry consensus standards.
**Investigation:** Expert in the causes of electrical failures, mechanisms of injury and loss, standards of care and safety.
**Litigation Consultant:** Experienced expert witness in electrical forensics, utility electrical incident inquires.
**Lineman, Foreman, Supervisor:** Bare-hand rated Journeyman Lineman with crew supervisory level skills in transmission and distribution overhead and underground systems, substation construction, maintenance and operations.
**Electrician:** Master Electrician, expert in installation and maintenance of commercial, industrial E&I systems.
**College Instructor:** Florida Certification; Successful experience in adult learner curriculum development, grant writing, technology transfer skills, outcome analysis, developing success measuring tools and administration of the learning environment.

**Jim Vaughn; Expert Credentials**
**Publications in the Previous Ten Years**

Electrical Distribution Awareness for 5G Telecommunication's Workers
Work Methods, Training and Manual; Ericsson Inc.
Sprint 5G national Contractor

Personal Protective Grounding Standard,
Arizona Public Service, Phoenix Arizona

Electrical Distribution Technology Program,
State of Florida, South Florida State College

Root Cause Analysis, Training and Lessons Learned
Incident Prevention Magazine, by Jim Vaughn, CUSP
Wednesday, 10 April 2019

Substation Protective Grounding Standard
Baltimore Gas and Electric, by Jim Vaughn, CUSP
Janary 2020

A Close Look at Step and Touch Potentials
Incident Prevention Magazine, by Jim Vaughn, CUSP
April 2022

Solving PPG – Without Electrical Math
Incident Prevention Magazine, by Jim Vaughn, CUSP
Friday, 14 December 2018

Containing Contagions in Close Quarters
Incident Prevention Magazine, by Jim Vaughn, CUSP
December 2021

The Value of a Site-Specific Health and Safety Plan
Incident Prevention Magazine, by Jim Vaughn, CUSP
Friday, 10 August 2018

Enforcement of Vehicle Weight and Load Securement Rules
Incident Prevention Magazine, by Jim Vaughn, CUSP
Tuesday, 12 June 2018

Current in Grounds Can Kill
Incident Prevention Magazine, by Jim Vaughn, CUSP
Wednesday, 18 April 2018

Lessons from Puerto Rico
Incident Prevention Magazine, by Jim Vaughn, CUSP
Wednesday, 21 February 2018

No Windows
Incident Prevention Magazine, by Jim Vaughn, CUSP
Friday, 15 December 2017

Practical Aviation for Power-Line Applications
Incident Prevention Magazine, by Jim Vaughn, CUSP
Monday, 11 September 2017

Training and Verification Requirements for the Safety of Electric Utility Workers
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Wednesday, 07 June 2017

Addressing Common Fall Protection Questions and Concerns
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Tuesday, 18 April 2017

The New Walking-Working Surfaces Final Rule
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Wednesday, 15 February 2017

Understanding Canine Behavior for the Protection of Utility Workers:
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 12 December 2016

Understanding Canine Behavior for the Protection of Utility Workers
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Wednesday, 12 October 2016

Practical Personal Grounding in Underground Work
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 22 August 2016

Practical Recommendations for Wire Stringing
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 10 June 2016

Grounding for Stringing in Energized Environments
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Tuesday, 26 April 2016

Safety Cops and the Continuum of Safety
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 12 February 2016

Practical Underground Safety: Handling Neutrals and Rescue
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Wednesday, 16 December 2015

Practical MAD and Arc Flash Protection
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Thursday, 17 September 2015

Practical Personal Protective Grounding
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 17 August 2015

Back to Basics: 'Gentlemen, This is a Football'
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Saturday, 20 June 2015

The OSHA-EEI Subpart V Settlement
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 20 April 2015

Addressing Anchorages
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 16 February 2015
Substation Entry Policies
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Wednesday, 10 December 2014

Stringing in Energized Environments
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Thursday, 16 October 2014

Fall Protection and the New Rule
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 08 August 2014

The Final Rule
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 20 June 2014

OSHA Forklift Certification Requirements
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 20 June 2014

Practical Elements for Developing a Safety Culture
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Tuesday, 18 February 2014

Grounding Trucks and Mobile Equipment
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 20 December 2013

Why You Need More than 1910 and 1926
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Thursday, 19 September 2013

Passing the CUSP Exam
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 19 August 2013

Live-Line Tool Maintenance Program
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 19 August 2013

ASTM F855 Grounding Equipment Specs Made Simple
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 21 June 2013

Bighorn Sheep vs. Lineworkers: What's the Difference?
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Friday, 03 May 2013
Understanding Grounding for the Protection of All Employees
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 29 April 2013

Arc Hazard Protection
<u>Incident Prevention Magazine</u>, by Jim Vaughn, CUSP
Monday, 18 February 2013

Working from Crane-Mounted Baskets
Incident Prevention Magazine, by Jim Vaughn, CUSP
Thursday, 13 December 2012

Enclosed Space Rescue
Incident Prevention Magazine, by Jim Vaughn, CUSP
Thursday, 11 October 2012

Ferroresonance Explained
Incident Prevention Magazine, by Jim Vaughn, CUSP
Monday, 27 August 2012

The Intersect: A Practical Guide to Work-Site Hazard Analysis
Incident Prevention Magazine, by Jim Vaughn, CUSP
Tuesday, 17 April 2012

What's Your Seat Belt IQ?
Incident Prevention Magazine, by Jim Vaughn, CUSP
Monday, 15 August 2011